UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY DELPHIN, | No. 2:15-cv-1697-KJM-EFB P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| Respondent. | |

Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302. Petitioner challenges a judgment of conviction entered against him on November 14, 2011 in the San Joaquin County Superior Court on charges of first degree murder. He seeks federal habeas relief on the grounds that: (1) his initial trial counsel was ineffective; (2) the trial court erred by declining to investigate his new counsel's declared doubts concerning his competency to stand trial; and (3) the trial court erred by instructing the jury with CALCRIM No. 702. Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

/////

1

**I.   Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Angelique Hewitt lived in Lathrop with her partner Janice Johnson, Johnson's two children, and Hewitt's young son. Hewitt's older son Lloyd Galtney visited often from the Bay Area. Defendant Valdez had become friendly with Hewitt after he and his brothers stopped someone from attacking Hewitt's young son. Valdez came by often and drank beer and smoked marijuana with Hewitt.
>
> On April 2, 2006, Galtney was visiting his mother when Valdez called and said a friend wanted to buy some marijuana. Galtney drove to a location about five minutes away to make the sale. He met Valdez and defendant Delphin and sold Delphin a half of an ounce of marijuana for $125–$150.
>
> Delphin was not happy with the sale; he weighed the marijuana and believed it was a few grams short. He wanted to go talk to the man who sold it. Valdez called Galtney and told him Delphin was not satisfied. Valdez told Galtney that Delphin wanted to talk to him and show him the marijuana. Galtney was not going to do anything; in his view it was a "done deal."
>
> About 30 minutes later, Delphin arrived at Hewitt's with Gary Hansen. Delphin approached Galtney while Hansen stayed back. Delphin had the marijuana and a scale. Galtney told him the marijuana had been tampered with. Delphin wanted his money back, but Galtney told him there were no refunds. Delphin then got "aggressive," and Galtney "chastised" him. The two men fought. Hewitt came out and broke up the fight. She told Delphin to leave. Delphin made the hand sign of a gun and said he would be back. Hansen heard Galtney say he was going to get a "strap," meaning a gun.
>
> Hewitt also made Galtney leave. She later called him to complain about what had happened.
>
> Hansen and Delphin returned to Delphin's. Valdez arrived in his car. Delphin wanted to do something; he wanted to "scare the guy." Delphin got two shotguns from the garage, loaded them, and put them in Valdez's car. He and Valdez left. Before they left, Valdez asked Delphin if he really wanted to "shoot at him." Hansen heard Delphin say no, he just wanted to "see if he's really going to pull out a strap."
>
> Valdez went to Hewitt's door and rang the bell. Hewitt saw it was Valdez and stopped Johnson from answering the door. She said she would go because the situation concerned her child. Hewitt told Valdez she did not

want problems and Valdez said he just wanted to talk. Hewitt stepped outside and locked the door. Delphin came around the garage and shot Hewitt.

Hewitt sustained two gunshot wounds: one in the face from four to six feet away and one in the shoulder from a distance of three feet. Both shots were fatal.

*People v. Valdez*, 2014 WL 3388558, at *1–2 (Cal.App. 3 Dist., July 11, 2014) (unpublished).

## II.     Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S. 34 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent

may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

/////

---

[1] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

4

Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether

5

a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III.    Petitioner's Claims**

   **A.    Ineffective Assistance of Counsel**

The immediate petition raises an unexhausted ineffective assistance of counsel claim which is unintelligible as articulated. Petitioner claims that "trial lawyer Ralph Cingcon selfishly performed a criminal act and breaking (sic) county jails lawyer client contraband rules and his performances (sic) was deficient because he couldn't have a proper lawyer client visit were (sic) there is no supervised listening." ECF No. 1 at 3.[2] He goes on to allege that lack of 'proper communication' resulted in an unspecified 'deficient error' in trial counsel's performance which deprived petitioner of a fair trial. *Id*. Finally, he claims that trial counsel, as a result of some

---

[2] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

unspecified disciplinary action, lacked the knowledge and understanding to explain petitioner's competency to the trial court. *Id*.

The record indicates that Mr. Cingcon was appointed to represent the petitioner on September 4, 2008. Lodg. Doc. No. 9 (Augmented Reporter's Transcript, Vol. 1 of 2) at 24-25. On April 13, 2009, Mr. Cingcon informed the trial court that, as of the date of his appointment, petitioner had "been in a fixed state of being unable to assist [him] in his defense." *Id*. at 36. Cingcon acknowledged that doctors had previously examined petitioner pursuant to California Penal Code § 1368[3] and found him fit for trial. However, he went on to reaffirm that, since his appointment, petitioner had been "utterly incapable, unable to assist [him] with anything in his defense. *Id*. at 37. Accordingly, Mr. Cingcon asked the trial court if petitioner might be revaluated under § 1368 to determine his sanity. *Id*. at 40. He went on to state, under questioning from the trial court, that there had been no change in petitioner's condition from the date of his appointment to April 13, 2009. *Id*. at 37. After hearing Mr. Cingcon's concerns, the trial court declined to reevaluate petitioner under 1368, explaining:

> My looking at the file May 31st, 2007, he was found insane within the definition of Section 1368. He was – he was sent off for treatment. He was returned on September 15th, 2008, it was found his sanity was restored within the definition of 1368.
>
> So the first question I asked you was whether or not there's been a significant difference or any difference from the time you have seen him – you were appointed in September of '08. And I think based on what you have said – also the fact that the reports indicated at the time he was found sane that he was a malingerer, I don't there's a basis to appoint another doctor or have him re-examined in this case. I think it's discretionary, but I don't think there's a legitimate basis for that.
>
> Now, I agree that 1368 is something that can take place at any time, even in the middle of a trial, but, at this point, I don't think there's a legitimate basis for having further reports on the defendant.
> And as far as the definitive ruling, I would say the definitive ruling was September 15th of '08, and that is that he is sane.

---

[3] Code § 1368 states in relevant part: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to [California Penal Code] Sections 1368.1 and 1369." Cal. Penal Code § 1368(b).

7

*Id*. at 41. Cingcon raised the issue again on September 19, 2011 and the trial court reaffirmed its decision not to order a second evaluation under 1368. *Id*. at 58-59. Nothing in the record sheds any light on petitioner's allegations that: (1) Cingcon committed a criminal act; (2) Cingcon committed a 'deficient error' because his communications with petitioner were 'supervised'; or (3) that Cingcon, because of some disciplinary action taken against him, was unable to explain the concerns with petitioner's competency to the trial court.

As a preliminary matter, this claim is unexhausted because it was not raised in the state appellate proceedings. Petitioner *did* argue that the trial court erred in refusing to reevaluate his competency after Cingcon voiced his concerns. Lodg. Doc. No. 11 (Appellant's Opening Brief) at 13. He did not, however, raise any argument as to Cingcon's effectiveness. Petitioner acknowledges as much, but argues that his appellate counsel was to blame insofar as he "did [the] bare minimum." ECF No. 1 at 5. In any event, the court is permitted (and elects to) reach the merits of this claim and dismiss it on that basis. *See* 28 U.S.C. § 2254(b)(2) (an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State); *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999) (district court may exercise discretion to consider merits of unexhausted habeas claim).

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id*. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id*. at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Petitioner's ineffective assistance of counsel allegations in the instant case are simply too vague to succeed. It is well established that "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Here, petitioner has not provided any factual context for his vague attributions of criminal conduct and disciplinary admonishment against Cingcon. Nor has he explained what specific 'deficient error' deprived him of a fair trial. These vague, unsupported allegations preclude a determination that either Cingcon's performance was deficient or that any alleged deficiency prejudiced petitioner's defense.

**B.    Trial Court's Failure to Investigate Counsel's Doubts as to Petitioner's Competency**

Next, petitioner argues that the trial court erred by failing to investigate his new counsel's doubts as to his competency to stand trial. ECF No. 1 at 26. The court of appeal considered this argument and rejected it, reasoning:

> In April 2007, Delphin's counsel declared a doubt as to Delphin's competency to stand trial pursuant to section 1368. The court appointed Drs. Hart and Antwon to evaluate Delphin. When Dr. Antwon proved unavailable, the court appointed Dr. Rogerson.
>
> Dr. Hart reported that Delphin claimed he was working for the government doing top-secret autopsies on aliens. The current charges were filed after Delphin helped an alien escape. Dr. Hart found Delphin's story was either delusional or more likely a fanciful fabrication designed "to deter his case into a state hospital setting." He found Delphin had no other discernible signs of mental illness. Delphin understood the charges and could assist counsel "if he chooses to do so." Dr. Hart found that Delphin was competent to stand trial.
>
> Dr. Rogerson reported that Delphin had a history of mental illness and treatment; he had been diagnosed with a psychotic disorder. While Delphin knew and understood the nature of the proceedings, he was not able to assist counsel; he needed "aggressive treatment."

Delphin's counsel told the court that Dr. Hart had been given additional information about Delphin's mental health history after completing his report. Dr. Cavanaugh, acting as a consultant for the defense, had suggested the 1368 proceedings and would concur with Dr. Rogerson's assessment. Based on the reports and the parties' stipulation as to Dr. Cavanaugh's concurrence, the court found Delphin not competent to stand trial. The court remanded Delphin for treatment at Napa State Hospital.

In August 2008, Napa State Hospital issued a certificate of mental competency as to Delphin. The assessment noted that Delphin spoke of aliens when discussing the charges against him but exhibited no other signs of mental illness or distress. The treatment team was of the opinion that Delphin was "malingering symptoms of mental illness" and recommended that Delphin be returned to court as competent to stand trial.

Shortly after this assessment, Delphin's counsel withdrew and the trial court appointed new counsel.

On September 15, 2008, the trial court announced that Delphin had been returned from the hospital and certified mentally competent. The proceedings against Delphin were reinstated.

In April 2009, Delphin's new counsel told the court that although he had hoped Delphin's condition would improve, Delphin continued to suffer from the same psychological condition and needed to be re-evaluated under section 1368. Counsel believed that Delphin's continuing confinement in a solitary cell compounded his disability. The court asked if there was any change in Delphin's condition since he had been declared competent to stand trial. Counsel said no, but asserted that Delphin was "utterly unable" to assist in his defense. The court noted the prior assessment had found Delphin was malingering. Since there was no difference in his condition, the court found no legitimate basis to examine Delphin, referring to that decision as "discretionary." Counsel said Delphin had told him he was hearing voices, spoke of aliens, and did not have a grip on reality. "Out of exasperation" counsel had "just given up." Counsel asked if he should proceed to trial with the court's ruling that Delphin was fine and fit. The court said yes. The court acknowledged that Delphin was not assisting his attorney, but found it was intentional and not due to some mental defect or disease.

At a proceeding a few months later, Delphin continually interrupted with inappropriate or nonsensical remarks. His counsel again expressed concerns; Delphin had engaged in a running conversation with himself since he entered the courtroom. Also, Delphin had lost 40 pounds. Counsel renewed the motion under section 1368. The court again denied the motion, finding that Delphin had already been examined and found to be malingering.

Just before jury selection, Delphin again behaved inappropriately, laughing and making comments. Counsel told the court Delphin had stopped taking his medication and had refused to come out of his cell to see the investigator, although he came out the next day. The court noted Delphin had not made any audible sounds until counsel pointed out his behavior; the court believed Delphin was "faking it." Counsel said Delphin "was exhibiting certain signs and behaviors in the hallway."

The court advised Delphin it was in his best interests to make a good impression to the jury and the court would not permit him to act out in front of the jury. Counsel wanted Delphin excused from the courtroom during jury selection. The court was uncertain if it could do that. Delphin continued to interrupt, distracting his attorney. After further interruptions, Delphin was removed from the courtroom.

The trial court concluded Delphin could waive his appearance during jury selection. The court accepted Delphin's waiver. Subsequently, Delphin indicated that he wanted to return. His counsel warned him that the jury would hold inappropriate behavior against him. The court questioned Delphin and asked if there would be further problems; Delphin said no. The court again warned him he would be removed if there were any interruptions or disruptions. Delphin was present throughout trial; at the conclusion the court put on the record that Delphin had "conducted himself in a perfect manner."

B. The Law

"A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

"When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. [Citation.] The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' [Citations.] [¶] When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" (*People v. Jones* (1991) 53 Cal.3d 1115, 1152–1153.) When "a competency hearing has already been held, the trial court may appropriately take its personal observations into account

11

in determining whether there has been some significant change in the defendant's mental state." (*Id*. at p. 1153.)

More is required to raise a doubt as to defendant's competency than mere bizarre actions or statements. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 403.) Disruptive conduct and courtroom outbursts do not necessarily demonstrate that defendant is unable to understand the proceedings or assist in his defense. (*People v. Mai* (2013) 57 Cal.4th 986, 1033.) In *People v. Medina* (1995) 11 Cal.4th 694, our Supreme Court found defendant's cursing and disruptive behavior "displayed an unwillingness to assist in his defense, but did not necessarily bear on his competence to do so, or reflect a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence." (*Id*. at p. 735.)

"A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) " 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' [Citations.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 727, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069.) The trial court's decision will be upheld if substantial evidence supports it. (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

C. Analysis

Delphin contends his second trial counsel made a sufficient showing to require the trial court to reinvestigate his competency. He cites the following points counsel raised with the court: Delphin was housed alone in administrative segregation; his symptoms persisted; counsel had "given up" and both counsel and the defense investigator had difficulty with Delphin; Delphin had lost 40 pounds and ceased taking his medicine; he once refused to leave his cell and acted "goofy" both in court and in the hallway.

Much of this evidence simply shows bizarre behavior, which is insufficient to raise a doubt as to Delphin's competence. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) Significantly, counsel never indicated that Delphin's condition had changed or worsened, only that it did not improve as he had hoped and that he was frustrated in dealing with Delphin. None of this evidence contradicts the trial court's finding, based on the report from Napa State Hospital and the court's own observations, that Delphin was malingering and his failure to assist in his defense was intentional. His outbursts were often timed to draw the most attention. Tellingly, once it was clear that the trial was proceeding, the outbursts and bizarre behavior stopped. Nothing that counsel pointed out to the court reflected a change in

12

> Delphin's condition from when he had been found competent or cast a serious doubt on that conclusion.
>
> Delphin contends the trial court applied the wrong standard for determining if a second competency hearing was required because it indicated its decision was discretionary. We note that in some instances the decision to conduct a competency hearing is discretionary. When the evidence casting doubt on an accused's present competence is less than substantial, it is within the trial court's discretion whether to order a competency hearing. (People v. Welch (1999) 20 Cal.4th 701, 742.) In any event, Delphin failed to show a substantial change in circumstances as to his competency so as to require a second hearing merely because his second lawyer declared a doubt.

*Valdez*, 2014 WL 3388558, at *5–7. Petitioner raised this claim in a petition for review filed with the California Supreme Court which was summarily denied. Lodg. Doc. No. 14 (Petition for Review and Order Denying Review).

### 1. <u>Applicable Legal Standards</u>

"[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 385 (1966). The relevant question in a procedural incompetence claim – that is whether a trial court erred in failing to hold a competency hearing – is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *De Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc). "Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations of the defendant's competence to stand trial." *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2002). A federal court's review of a procedural competency claim is limited to the evidence that was before the trial court judge, however. *United States v. Lewis*, 991 F.2d 524, 527 (9th Cir. 1993). Finally, a state court's determination that no competency hearing was required is a factual finding to which a federal court must defer unless that finding is unreasonable within the meaning of 28 U.S.C. § 2254(d)(2). *Mendez v. Knowles*, 556 F.3d 757, 771 (9th Cir. 2009).

2. **Analysis**

As the state appellate court's opinion noted, there is no dispute that petitioner was examined, declared incompetent by the trial court, and assigned treatment at the Napa State Hospital in 2007 and the first half of 2008. The hospital eventually certified that petitioner was competent to stand trial in August 2008 and its staff offered their opinion that the petitioner was malingering symptoms of mental illness. The only question before the court is whether the state appellate court was objectively unreasonable in concluding that petitioner was not entitled to a second competency hearing. This court concludes that it was not.

As noted *supra*, the trial judge questioned counsel as to whether petitioner's condition had changed in some appreciable way between September 2008 and the date of the April 2009 hearing. Lodg. Doc. No. 9 (Augmented Reporter's Transcript, Vol. 1 of 2) at 41. Trial counsel stated his opinion that it had not. *Id*. at 37. Based on this information and noting hospital staff's opinion that petitioner was malingering, the trial judge concluded that the hospital's certification of competence was controlling. *Id*. at 41. The court of appeal also emphasized this point in denying petitioner's claim, noting that "[n]othing that counsel pointed out to the court reflected a change in Delphin's condition from when he had been found competent or cast a serious doubt on that conclusion." *Valdez*, 2014 WL 3388558, at *7. This factual determination is presumed correct and petitioner bears the burden of rebutting it with clear and convincing evidence. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). He has failed to do so. In closing, the court notes that under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'").

Based on the foregoing, petitioner is not entitled to habeas relief on this claim.

**C.     Error in Instructing CALCRIM No. 702**

Lastly, petitioner contends that the trial court erred in its instruction of CALCRIM No. 702 because it relieved the prosecution of the burden of having to prove that he acted with the

intent to kill in order to find the special circumstance of murder by means of lying in wait. The court of appeal considered this argument and rejected it:

> Delphin contends the trial court erred in instructing the jury with CALCRIM No. 702 because it erroneously informed the jury that the People did not have to prove the actual killer acted with intent to kill for the special circumstance of murder by means of lying in wait to be true. While first degree murder by means of lying in wait requires "only a wanton and reckless intent to inflict injury likely to cause death," the lying-in-wait special circumstance requires the intent to kill. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148–1149; *see also People v. Superior Court (Bradway) (2003)* 105 Cal.App.4th 297, 309–310.) Although another instruction correctly informed the jury that the special circumstance required an intentional killing, Delphin contends the conflicting instructions created prejudicial error. We disagree.
>
> A. The Instructions on the Lying–in–Wait Special Circumstance
>
> The trial court gave two instructions on the lying-in-wait special circumstance. One applied to the actual killer and the other applied to an accomplice.
>
> As to the accomplice, the court instructed the jury using the language of CALCRIM No. 702 in part as follows: "If you decide that a defendant is guilty of first-degree murder but was not the actual killer, then, when you consider the special circumstance of murder while lying in wait, you must also decide whether the defendant acted with the intent to kill. In order to prove this special circumstance for a defendant who is not the actual killer, but who is guilty of first-degree murder as an aider and abettor, the People must prove that the defendant acted with the intent to kill. *The People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true*." (Emphasis added.)
>
> The court also instructed with CALCRM No. 728, which addresses the special circumstance as applied to the actual killer. The court instructed in part as follows: "A defendant is charged with a special circumstance of murder committed by means of lying in wait in violation of Penal Code Section 190.2(a)(15). To prove that this special circumstance is true, the People must prove that: [¶] 1. *The defendant intentionally killed Angelique Hewitt*; [¶] And, [¶] 2. The defendant committed the murder by means of lying in wait. [¶] A person commits a murder by means of lying in wait if: [¶] 1. He concealed his person from the person killed; [¶] 2. He waited and watched for an opportunity to act; [¶] 3. Then he made a surprise attack on the person killed from a position of advantage; [¶] And, [¶] 4. *He intended to kill the person by taking the person by surprise*." (Emphasis added.)

/////

15

B. The Law and Analysis

It is well established in California that we determine the correctness of jury instructions from the entire charge to the jury and not by considering only parts of an instruction or a particular instruction. (*Bolin*, *supra*, 18 Cal.4th at p. 328.) In assessing whether an instructional error occurred, the test is "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire trial record and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

"The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) We presume that the jury properly disregarded inapplicable instructions. (*See People v. Chavez* (1958) 50 Cal.2d 778, 790; *People v. Hairgrove* (1971) 18 Cal.App.3d 606, 609.)

Here, CALCRIM No. 702 misstated the law as to the People's burden in Delphin's case to prove his intent to kill as part of the lying-in-wait special circumstance. As the parties recognize and the use note indicates, this instruction should not have been given in this case. This instruction expressly provided that it applied only if the defendant was not the actual killer ("If you decide that a defendant is guilty of first-degree murder but was not the actual killer").

Here, the record established that the jury found Delphin was the actual killer because the jury found true the allegation that he discharged a firearm causing death. Thus, the jury would not have looked to CALCRIM No. 702 to determine whether the special circumstance was true as to Delphin. Instead, the jury would have looked to CALCRIM No. 728, which applied to the actual killer. As we have emphasized ante, this instruction stated twice that the killing must be intentional. Construing the instructions as a whole and applying the well-established presumption that the jury followed the instructions which appropriately applied to its factual findings, there is not a "reasonable likelihood" that the jury found the lying-in-wait special circumstance true as to Delphin without finding that he intentionally killed Hewitt.

*Valdez*, 2014 WL 3388558, at *7–9. Petitioner raised this claim in a petition for review filed with the California Supreme Court which was summarily denied. Lodg. Doc. No. 14 (Petition for Review and Order Denying Review).

/////

/////

16

1. **Applicable Legal Standards**

In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (internal quotations omitted). A challenge to a trial court's jury instructions is reviewed under the standards in *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) – that is, whether the error had a substantial and injurious effect in determining the jury's verdict. *See California v. Roy*, 519 U.S. 2, 5 (1996). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Lastly, the reviewing court should consider an instruction in the context of the entire record rather than judging it in isolation. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991).

2. **Analysis**

At petitioner's trial, the court gave two instructions on the lying in wait special circumstance – CALCRIM No. 702 and CALCRIM No. 728. Lodg. Doc. No. 3 (Clerk's Transcript on Appeal, Vol. 3 of 3) at 737-742. The former applied to an accomplice and the latter to the actual killer. *Id*. As noted above, the court of appeal acknowledged that CALCRIM No. 702 misstated the prosecution's burden with respect to proving petitioner's intent to kill. It concluded, however, that there was no reversible error because the jury would never have reached that instruction given its finding that petitioner discharged a firearm causing the death. After review of the record, this court reaches the same conclusion.

First, the jury indisputably concluded that petitioner was Angelique Hewitt's actual killer. Lodg. Doc. No. 2 (Clerk's Transcript on Appeal, Vol. 2 of 3) at 490-493. Second, upon reaching that determination, the jury should have looked exclusively to CALCRIM No. 728 which *did* contain an instruction that the special circumstance could only be found where the killing was intentional. That instruction expressly provided that the lying in wait circumstance required the prosecution to prove (1) that "[t]he defendant intentionally killed Angelique Hewitt" and (2) that

17

"[t]he defendant committed the murder by lying in wait." Lodg. Doc. No. 3 (Clerk's Transcript on Appeal, Vol. 3 of 3) at 741. The instruction went on to note that lying in wait required the jury to find that "[the defendant] intended to kill the person by taking the person by surprise." *Id*. Third, the jury is presumed to have followed the trial court's instructions and, consequently, to have applied CALCRIM No. 728 rather than CALCRIM No. 702 in this case. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (holding that a jury is presumed to follow its instructions); *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011) ("A habeas court must presume that jurors follow the jury instructions."). The court notes that petitioner has not offered any convincing evidence which might rebut this presumption.

In light of the foregoing, petitioner cannot establish that the erroneous instruction of CALCRIM No. 702 had a substantial and injurious effect in determining the jury's verdict. As such, he is not entitled to habeas relief on this claim.

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section

/////

/////

/////

18

2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: December 12, 2017.

/s/ Edmund F. Brennan
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE